**SOLVAY PHARMACEUTICALS, INC., Plaintiff,**

v.

**GLOBAL PHARMACEUTICALS and Impax Laboratories, Inc., Defendants.**

**No. Civ. 03–2854DWFSRN.**

United States District Court, D. Minnesota.

Jan. 9, 2004.

John B. Gordon, and Peter J. Goss, Faegre & Benson, Minneapolis, MN; Saul H. Perloff, C. David Kinder, Pamela St.

John, Fred I. Williams, and Joseph Sorkin, Akin Gump Strauss Hauer & Feld, San Antonio, TX, for Plaintiff.

Kevin M. Magnuson, and Jay W. Schlosser, Briggs & Morgan, Minneapolis, MN; Rebecca Goldsmith, Peter Curtin, and Julie A. Petruzzelli, Venable Baetjer Howard & Civiletti, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on November 7, 2003, pursuant to Defendants' Motion to Dismiss. For the following reasons, Defendants' Motion is granted in part and denied in part.

### Background

Plaintiff Solvay Pharmaceuticals, Inc., is a Georgia corporation with its principal place of business in Marietta, Georgia. Solvay also has a manufacturing and packaging facility in Baudette, Minnesota. Relevant to this lawsuit, Solvay develops, manufactures, and markets its Creon line of prescription microencapsulated pancreatic enzyme supplements. Creon is used to treat cystic fibrosis patients who suffer from pancreatic exocrine insufficiency, a disorder that keeps their bodies from producing the proper enzymes to digest food. Solvay's line of Creon products include Creon 5, Creon 10, and Creon 20, based upon how many units of the lipase enzyme each product contains. (*See* Complaint at ¶ 19.)

Defendant Impax Laboratories, Inc., is a Delaware corporation with its principal place of business in Haywood, California. Defendant Global Pharmaceuticals is the

generics marketing division of Impax. According to Solvay's Complaint, Defendants manufacture, distribute, and market a pancreatic enzyme supplement under the trade name Lipram.

Solvay contends that Defendants have falsely promoted Lipram as a substitute for Creon to wholesalers, chains, distributors, mail order houses, independent pharmacies, and managed health care organizations. (*See* Complaint at ¶¶ 6–9.) Solvay asserts that Defendants' "knock-offs" of Solvay's Creon line include Lipram "CN 10" and "CN 20." (*See id.* at 25.) Solvay further alleges that Defendants are marketing their Lipram products either expressly or by implication as "generic" versions of Creon, even though Lipram is not, in fact, equivalent to Creon. (*See id.* at 24.)

Solvay's Complaint provides an undisputed account of the different means by which states regulate the substitution of prescription drugs by pharmacists. According to Solvay, the majority of states prohibit drug substitution of a generic for a brand name drug unless the substitute is therapeutically equivalent to the brand (i.e., the drug is identical in active ingredients, strength, and dosage form and the drug has the same rate and extent of absorption) or the drug appears in the FDA's Orange Book, a list of brand-name drugs listed along with their FDA-determined therapeutic equivalents. In fewer than ten states, a generic need only be pharmaceutically equivalent (i.e., the drug has identical active ingredients, strength, and dosage form) in order to be substituted. (*See* Complaint at ¶¶ 31–33.)

Neither Lipram or Creon currently appear in the Orange Book. (*Id.* at ¶ 36, n. 5.) Solvay contends that Defendants have not studied whether Lipram is a therapeutic equivalent of Creon. (*Id.* at 37.) In addition, Solvay asserts that Lipram is not pharmaceutically equivalent to Creon. (*Id.* at 38.) Despite this alleged lack of equivalence, Solvay contends that "in a variety of promotional materials Global has stated or implied that Lipram is 'generic,' 'comparable,' and an 'alternative' to Creon." (*Id.* at 28.) Solvay asserts that "Defendants' marketing tactics mislead their audience into believing that Lipram is a generic equivalent to, and substitutable for, Creon." (*Id.*) Solvay argues that Defendants' allegedly misleading marketing efforts have damaged Creon's sales and reputation. (*See* Complaint at 39.)

Based upon these allegations, Solvay asserts the following causes of action against Defendants: (1) false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition in violation of section 43(a) of the Lanham Act; (3) violation of the Minnesota Unfair Trade Practices Act, Minn.Stat. § 325D.13; (4) violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.44; (5) violation of the Minnesota False Advertising Act, Minn.Stat. § 325F.67; (6) violation of the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69; and (7) a request for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. Solvay has filed a nearly identical complaint in the United States District Court, District of Minnesota, against another drug company. *See Solvay Pharmaceuticals, Inc. v. Ethex Corp., et al.,* (Civ. No. 03–2836 (JRT/FLN)) (D. Minn., filed Apr. 10, 2003).

Defendants have brought this motion to dismiss on all counts. First, Defendants assert that Counts I–VII fail because Solvay has attempted to use the Lanham Act and other state laws as a vehicle to assert violations of the Food, Drug and Cosmetic Act ("FDCA"), under which no such private causes of action exist. Alternatively, Defendants assert that Counts I–VI of the

Complaint fail for a lack of specificity; Count VI fails because the Consumer Fraud Act does not protect entities who are not "consumers" under Minnesota law; and Count VII fails because it does not address conduct that can be remedied by Defendants.

### 1. Standard of Review

In deciding a motion to dismiss, the Court must assume all facts in the Complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986). The Court grants a motion to dismiss only if it is clear beyond any doubt that no relief could be granted under any set of facts consistent with the allegations in the Complaint. *Id.* The Court may grant a motion to dismiss on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The Court need not resolve all questions of law in a manner which favors the complainant; rather, the Court may dismiss a claim founded upon a legal theory which is "close but ultimately unavailing." *Id.* at 327, 109 S.Ct. 1827.

### 2. Preemption

Defendants assert that Solvay's claims fail because they attempt to redress violations of the FDCA, claims which are within the exclusive jurisdiction of the FDA. Solvay, on the other hand, asserts that claims for falsely stating or implying that a drug is generic, equivalent, or substitutable are actionable under the Lanham Act and Minnesota law, even if in part regulated by the FDA.

In its Complaint, Solvay asserts that Defendants have not tested Lipram to determine if Lipram was bioequivalent or otherwise therapeutically equivalent to Creon. (Complaint at ¶ 27.) In fact, Solvay contends that Lipram is neither bioequivalent nor therapeutically equivalent to Creon. (*See id.*) However, despite this alleged lack of testing, Solvay asserts that Defendants have explicitly or implicitly marketed Lipram as a "generic," "comparable," "alternative," or "equivalent" to Creon. (*See id.* at ¶¶ 28, 48.) Solvay alleges that "Defendants' marketing tactics mislead their audience into believing that Lipram is a generic equivalent to, and substitutable for, Creon." (*Id.*) It is in reference to these assertions of false and misleading advertising that Solvay has brought its claims for relief under the Lanham Act and Minnesota state law.

The Lanham Act provides a private remedy to a plaintiff who can prove that it has been harmed by "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Minnesota law similarly prohibits false and misleading statements related to the sale of merchandise. *See* Minn.Stat. §§ 325F.69, subd. 1; 325D.01–.16, 325D.43–.48, 325F.67. The FDCA, on the other hand, " 'is not focused on the truth or falsity of advertising claims' but on protecting the public interest in safety and efficacy" of food, drugs, and cosmetics and does not allow for private rights of action. *See Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir.1993) (citing *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 230 (3rd Cir.1990); *see also* 21 U.S.C. § 337 ("all proceedings for the enforcement of or to restrain violations of [the FDCA] shall be by and in the name of the United States.").

The Eighth Circuit has not decided the issue of whether claims for false and misleading advertising under the Lanham

Act and state law are preempted by the FDCA.[1] However, the parties primarily rely upon two cases in support of their opposing positions.

First, in support of its preemption argument, Defendants cite *Ethex Corp. v. First Horizon Pharm. Corp.*, 228 F.Supp.2d 1048 (E.D.Mo.2002). *Ethex* involved a dispute over the allegedly false advertising and marketing of prenatal vitamins. First Horizon brought a counterclaim under the Lanham Act and various Missouri state laws alleging that Ethex had illegally attempted to have its products listed as generic versions of First Horizon's drugs in pharmacist databases. *Id.* at 1051. Similar to the facts in this case, neither of the parties' prenatal vitamins were subject to FDA approval. *Id.* at 1052. First Horizon's arguments in the counterclaim focused on the fact that Ethex's use of the word "generic" in its marketing implied FDA-defined concepts, and therefore the claims were preempted by the FDCA. *Id.* at 1055. The court dismissed First Horizon's counterclaims to the extent that they were based on Ethex's marketing of its products as generic or alternative to First Horizon's vitamins. *Id.* The court noted that because "the express language" of First Horizon's counterclaim spoke directly to provisions of the FDCA, the matter was best left to the expertise of the FDA. *Id.* Thus, the court held that First Horizon's counterclaims, brought under both the Lanham Act and Missouri state law, were preempted. *Id.* at 1055, 1058.

Solvay, on the other hand, points to the Fourth Circuit's opinion in *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir.1993), for the proposition that its Lan-

ham Act and state law claims are not preempted. In *Mylan*, the Fourth Circuit reviewed Mylan's claims for false and misleading advertising brought under the Lanham Act. Specifically, Mylan asserted that the defendants had falsely marketed its drugs as properly approved by the FDA and as "bioequivalent" to Mylan's drugs. *Id.* at 1137–38. The court found that Mylan's claims regarding the defendants' alleged false representations about FDA approval constituted an inappropriate attempt to use the Lanham Act as a means to enforce the FDCA. *Id.* at 1139. Thus, those claims were preempted. However, the court sustained Mylan's claims related to the alleged lack of generic equivalence and bioequivalence. *Id.* at 1138.

The Court finds the Fourth Circuit's decision in *Mylan* instructive in defining the line between those claims that should be preempted and those that should not. The *Mylan* court would not sustain claims for false representations of FDA approval, but did allow claims related to allegedly false statements regarding bioequivalence or generic equivalence. *Mylan*, 7 F.3d at 1138–39. Here, Solvay's claims are not related to FDA approval, or lack thereof. Solvay has raised claims based upon Defendants' allegedly false marketing assertions that the Lipram supplements are "generic," "comparable," "substitutable" or "equivalent" to Solvay's Creon line. Undisputedly, neither Creon nor Lipram is listed in the FDA's Orange Book. FDA approval is not required in order to substitute the products or to make a determination of bioequivalence or therapeutic equivalence. In addition, the FDA currently does not regulate the substitution of Li-

---

1. In *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, the Eighth Circuit sustained claims for false advertising related to claims regarding the comparative bioavailability of a drug used to treat hyper-

tension and angina. 93 F.3d 511 (8th Cir. 1996). However, the court did not address specifically the interplay between FDCA preemption and the Lanham Act and state law claims.

pram for Creon in any manner. Without any claims or factual assertions that tie Solvay's claims to FDA approval, Solvay has not attempted to privately enforce the provisions of the FDCA. *Cf., id.* at 1139.

In this same vein, the Court disagrees with Defendants' broad reading of *Ethex.* Specifically, the Court finds that the factual scenario of *Ethex* is distinguishable. The *Ethex* court focused on the express language of the counterclaims, noting that "[t]he touchstone of Defendant's argument focuses on the fact that the word 'generic' implies FDA endorsement and certain FDA-defined concepts." *See Ethex,* 228 F.Supp.2d at 1055. As noted, Solvay's claims here do not relate to or allege false assertions of FDA approval. Thus, the Court does not run the risks expressed in *Ethex* of usurping the FDA's approval or encroaching upon FDA jurisdiction when no FDA regulatory approval over the substitution is either alleged or in effect.

### 3. Specificity

■ Alternatively, Defendants assert that Solvay's claims under the Lanham Act and Minnesota law should be dismissed because Solvay failed to plead them with the requisite particularity of Fed.R.Civ.P. 9(b). Solvay denies that its claims are subject to 9(b)'s particularity requirements, but further argues that even under a heightened pleading standard, it has plead with sufficient particularity.

Solvay has plead the following:

Several years ago, [Defendants] saw an opportunity to exploit the success of Creon by creating a knock-off drug called Lipram™ (hereinafter "Lipram"). [Defendants] falsely promote Lipram in order to encourage pharmacists to dispense Lipram to patients as a generic substitute for Creon. (Complaint at ¶ 3.)

Upon information and belief, Impax manufactures, and Global markets and sells, what they (often falsely) call, expressly or by implication, "generic" versions of popular brand-name prescription drugs. (*Id.* at ¶ 24.)

Upon information and belief, prior to launching Lipram, Defendants did not perform any tests on Lipram to determine if it was bioequivalent or otherwise therapeutically equivalent to Creon. Furthermore, upon information and belief, Lipram is not bioequivalent or therapeutically equivalent to Creon. (*Id.* at ¶ 27.)

Upon information and belief, Defendants began marketing Lipram despite the absence of safety, efficacy, or equivalency testing. Rather than promoting Lipram on its own merits, Defendants falsely and deceptively promote the product directly to drug wholesalers, distributors, pharmacies and others as a generic to Creon. Specifically, in a variety of promotional materials Global has stated or implied that Lipram is "generic," "comparable," and an "alternative" to Creon. Further, upon information and belief, the "CN–10" and "CN–20" designations for Lipram are a deliberate reference to Creon in order to facilitate generic substitution. Defendants' marketing tactics mislead their audiences into believing that Lipram is a generic equivalent to, and substitutable for, Creon. (*Id.* at ¶ 28.)

Although Defendants market Lipram as equivalent to or substitutable for Creon, the drugs are not generic under federal law or any state law. The FDA has not determined that Lipram is therapeutically equivalent to Creon. Lipram has no Orange Book rating and, upon information and belief, no bioequivalency data or therapeutic equivalency data. (*Id.* at ¶ 34.)

Because Lipram is not listed as a therapeutic equivalent to Creon in the Orange Book, it is unlawful for pharmacists to substitute Lipram for prescriptions of Creon in Orange Book states. (*Id.* at ¶ 36 (footnote omitted).)

Defendants have marketed and continue to market Lipram as being comparable or equivalent to Creon and, in doing so, have deceived, misled, and confused consumers and enabled Defendants to trade off of Solvay's reputation and goodwill. (*Id.* at ¶ 48.)

Defendants have, in connection with the sale of Lipram, knowingly misrepresented its true quality and ingredients. (*Id.* at ¶ 57.)

Through their marketing and advertising, Defendants have intentionally and willfully made, published, disseminated, circulated, and placed before the public advertisements containing false, deceptive, and misleading statements about Lipram, in the context of commercial marketing in the State of Minnesota and elsewhere. (*Id.* at ¶ 72.)

Defendants have used and employed misrepresentations, misleading statements, and/or deceptive practices in the sale of Lipram. (*Id.* at ¶ 78.)

The Court need not reach the issue of what pleading standard applies because the Court finds that even if Solvay's claims are "grounded in fraud," as Defendants allege, and thus even if a heightened pleading requirement applies to Solvay's claims under the Lanham Act and Minnesota law, Solvay has plead with sufficient specificity to meet the pleading standards of both Fed.R.Civ.P. 8 and 9(b). The Complaint asserts that Defendants have made false and misleading representations in advertising and marketing regarding the substitutability of Lipram for Creon. These assertions of false and misleading representations are sufficiently particular-

ized to facilitate Defendants' ability to respond to and prepare a defense to the allegations brought against them. *See Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir.1995). Defendants' motion to dismiss is denied on this issue.

**4. Minnesota Consumer Fraud Act**

■ Defendants also assert that Count VI of Solvay's Complaint should be dismissed because the Minnesota Consumer Fraud Act is intended to protect the consumers of goods, but not the merchants who are the recipients of Defendants' product here. The Court agrees.

The Minnesota Consumer Fraud Act provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Minn.Stat. § 325F.69, subd. 1. In support of their argument that the Minnesota Consumer Fraud Act does not apply to these transactions, Defendants cite several Minnesota cases for the proposition that consumers, but not merchants, are protected by the Consumer Fraud Act. *See, e.g., Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 7–8 (Minn. 1992), *overruled in part on other grounds, Ly v. Nystrom*, 615 N.W.2d 302, 314 n. 25 (Minn.2000) (noting the distinction between "experienced commercial parties and ordinary consumer transactions and finding that because the party was a consumer, not a merchant, the transaction fell within the scope of consumer transactions regulated by the Consumer Fraud Act);

see also *Tisdell v. ValAdCo.*, Civ. No. C0–01–2054, 2002 WL 31368336 at *10 (Minn. App. Oct.16, 2002); *Huntting Elevator Co. v. Biwer*, Civ. No. C998–548, 1998 WL 747170 at *2 (Minn.App. Oct.27, 1998). Solvay alleges that the Defendants sell Lipram to wholesalers, chains, distributors, mail order houses, independent pharmacies, and managed health care organizations. (*See* Complaint at ¶¶ 6–9.) Because of their expertise in the pharmaceutical industry, these entities fall within the U.C.C.'s definition of merchant, as they are entities that deal in goods of the kind or otherwise by occupation hold themselves out as having knowledge or skill peculiar to the practices or goods involved in the transactions. *See WatPro,* 491 N.W.2d at 7–8 (citing Minn.Stat. § 336.2–104(1)(1990)).

Moreover, the Court finds no merit to Solvay's argument that this case is similar to the standing asserted by Blue Cross & Blue Shield in *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996). Solvay does not hold the same interest in consumer health and protection as a large health insurance company. The Minnesota Consumer Fraud Act does not apply to Solvay's allegations. Defendant's motion to dismiss is granted in this regard.

**5. Declaratory Relief**

 Finally, Defendants assert that Count VII of Solvay's Complaint should be dismissed because it does not request relief that can be granted against Defendants. In Count VII, Solvay requests a declaration from this Court that Lipram may not be lawfully substituted for prescriptions of Creon in Orange Book, Therapeutic Equivalence, or Pharmaceutical Equivalence states. Although Solvay attempts to recast this request as one directed at the marketing behavior of Defendants, the request plainly seeks relief that only could be granted against pharmacists

or retailers—the entities that actually perform the substitution. The Court does not have subject matter jurisdiction to make such a declaration against entities that are not party to this suit. As such, Defendants' motion to dismiss is granted on this issue, and Count VII of Solvay's Complaint is dismissed.

For the reasons stated, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Dismiss (Doc. No. 14) is **GRANTED IN PART AND DENIED IN PART**, as follows:

 a. Defendants' Motion to Dismiss Counts VI and VII of Plaintiff's Complaint is **GRANTED**; and

 b. Defendants' Motion to Dismiss Counts I through V of Plaintiff's Complaint is **DENIED**.